(Eddie) Jae K. Kim (CA ID No. 234464)
Tiffine E. Malamphy (CA ID No. 312239)
**LYNCH CARPENTER, LLP**
117 E. Colorado Blvd., Suite 600
Pasadena, CA 91105
Tel:    (213) 723-0707
Fax:   (858) 313-1850
ekim@lcllp.com
tiffine@lcllp.com

Jennifer M. French (CA ID No. 265422)
**LYNCH CARPENTER, LLP**
1234 Camino Del Mar
Del Mar, CA 92014
Tel:    (619) 762-1910
Fax:   (858) 313-1850
jennf@lcllp.com

Gary F. Lynch
Connor P. Hayes
Patrick F. Donathen
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Tel.:   (412) 322-9243
Fax:   (724) 656-1556
gary@lcllp.com
connorh@lcllp.com
patrick@lcllp.com

*Attorneys for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL HAIDEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC, GENERAL MOTORS HOLDINGS LLC, ONSTAR LLC, LEXISNEXIS RISK SOLUTIONS, INC., and VERISK ANALYTICS, INC.,<br><br>Defendants. | Case No. 2:24-cv-4030<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Nathaniel Haiden ("Plaintiff") complains upon knowledge as to himself and his own actions and upon information and belief as to all other matters against Defendants General Motors LLC ("General Motors" or "GM"), General Motors Holdings LLC ("GM Holdings"), OnStar LLC, ("OnStar"), LexisNexis Risk Solutions, Inc. ("LexisNexis"), and Verisk Analytics, Inc. ("Verisk") (collectively, "Defendants"), as follows:

## I.   SUMMARY OF ALLEGATIONS

1.   For many consumers, "[a] car, to its driver, can feel like a sanctuary. A place to sing favorite songs off key, to cry, to vent, or to drive somewhere no one knows you're going."[1]

2.   But contrary to consumers' expectations, modern cars are instead "surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside -- even where and when we do it."[2]

3.   Defendant General Motors has long manufactured and sold consumer vehicles in the United States and around the world, under well-known brand names like Chevrolet, GMC, Cadillac, and Buick. The sale of these vehicles to consumers has historically constituted the bulk of GM's profits.

4.   As cars have increasingly become "computers on wheels" equipped with advanced software and GPS tracking, however, GM has found an additional way to profit from consumers: their driving data.

5.   Specifically, GM has deceived consumers like Plaintiff into sharing a wide array of their driving data, including location data, under the guise of

---

[1] Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, N.Y. Times (Mar. 11, 2024), https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.

[2] Jen Caltrider et al., *After Researching Cars and Privacy, Here's What Keeps Us Up at Night*, Privacy Not Included (Sept. 6, 2023), https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/.

improving users' driving safety—and then selling that data to third parties like LexisNexis and Verisk for millions of dollars a year. GM engages in this practice despite an array of accuracy issues in the data it collects.

6.  LexisNexis and Verisk then sell this unreliable and decontextualized driving data to insurance companies—who in turn use the data to substantially increase consumers' auto insurance rates.

7.  Plaintiff is one of the millions of GM users whose driving data was collected and exploited by Defendants without his full knowledge and consent, and he has suffered significantly higher insurance rates as a result.

8.  Plaintiff brings this action on behalf of himself and members of the Classes (defined below) for statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained, injunctive relief, and all other just and proper relief on behalf of all persons whose driving data was unlawfully captured, stored, and/or transferred or sold by Defendants without full notice or consent.

## II.  **<u>PARTIES</u>**

9.  Plaintiff Nathaniel Haiden is a natural person and citizen of the State of California and a resident of Los Angeles County. Plaintiff has owned a GM-manufactured Chevrolet Bolt EUV since December 2022.

10.  Defendant General Motors LLC is a United States corporation headquartered in Detroit, Michigan, and incorporated under the laws of Delaware.

11.  Defendant General Motors Holdings LLC is a United States corporation headquartered in Detroit, Michigan, and incorporated under the laws of Delaware.

12.  Defendant OnStar LLC is a United States corporation headquartered in Detroit, Michigan, and incorporated under the laws of Delaware.

13.    Defendant LexisNexis Risk Solutions Inc. is a United States corporation headquartered in Alpharetta, Georgia, and incorporated under the laws of Delaware.

14.    Defendant Verisk Analytics, Inc. is a United States corporation headquartered in Jersey City, New Jersey, and incorporated under the laws of Delaware.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the Classes are citizens of states different from some Defendants.

16.    The Court has personal jurisdiction over Defendants because Defendants have affirmatively established and maintained sufficient contacts with California and conduct significant business in this State.

17.    The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens of California while they were located within California. At all relevant times, Defendants targeted their goods and services to California citizens, and knew that their practices would directly result in collection of information from California citizens while those citizens operate vehicles in California. Defendants chose to avail themselves of the business opportunities of marketing and selling their goods and services in California and collecting real-time data from California drivers while driving within the state, and the claims and harm alleged herein specifically arise from those activities.

18.    Moreover, various sections of OnStar's Privacy Policy have a California-centric focus.  Only one other state is so singled out in the Privacy Policy.

19.     This Court is also the proper venue for this action pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Further, California has the greatest material interest in protecting the citizens in the State of California and enforcing the California Unfair Competition Law, California False Advertising Law, California Consumer Privacy Act, and California Invasion of Privacy Act, given that the collection of Plaintiff's driving data occurred within California.

## IV.   **FACTUAL ALLEGATIONS**

### *GM & OnStar*

20.     GM is one of the largest automobile manufacturers in the United States, and the world.  In 2023, GM sold roughly 2.6 million vehicles across the United States.[3]

21.     In the 1990s, GM entered into a partnership with several technology companies to form the OnStar Corporation, which would produce an embedded "telematics" system for use in GM vehicles.

22.     "Telematics," a term which came into widespread use with the introduction of OnStar, is a combination of "telecommunication" and "informatics," and describes services that provide information about a portable device via telecommunications networks. Today telematics often describes vehicle systems that combine Global Positioning System ("GPS") and cellular technologies with onboard electronics. They can include safety, communication, vehicle diagnostic and entertainment features.[4]

23.     The earliest versions of OnStar's telematics system would use a cellular connection to provide crash notification and security services to GM

---

[3] Michael Wayland, *GM's 2023 U.S. Vehicle Sales Were Its Best Since 2019*, CNBC (Jan. 3, 2024), https://www.cnbc.com/2024/01/03/gm-2023-us-vehicle-sales.html.

[4] Shanna Freeman, *How OnStar Works*, HowStuffWorks, https://auto.howstuffworks.com/onstar.htm.

vehicle owners, on a subscription basis, i.e. OnStar's original purpose was to help troubled drivers and vehicle owners with location-specific assistance.[5]

24.     Over time, the services provided by OnStar for GM vehicle owners has dramatically expanded, and GM now offers customers subscription-based communications, in-vehicle security, emergency services, turn-by-turn navigation, and remote diagnostics mechanisms utilizing vehicles' onboard telematics system that GM markets under the "OnStar" brand.

25.     To provide these services, the hardware and wires comprising a vehicle's OnStar system can gather data from both the onboard diagnostics system and built-in location-tracking GPS functionality. OnStar systems also use cellular technology to transmit vehicle and consumer data, as well as for voice communications.

26.     For example, OnStar can transmit GPS data through the cellular data connection to provide turn-by-turn directions to drivers, or to alert emergency services of a vehicle's location when it detects a crash. OnStar can also transmit data collected from a driver's vehicle, such as transmitting a vehicle's mileage for insurance purposes, or providing vehicle health reports to GM.

27.     Further, OnStar can connect to a mobile application on a driver's mobile phone, which allows users to review data about their vehicle and enables users to control certain functions of their car remotely, such as unlocking doors or starting the vehicle.

### *The OnStar Smart Driver Application*

28.     In 2016, GM & OnStar launched a new use of OnStar's built in diagnostics and connectivity, titled OnStar Smart Driver ("Smart Driver").

29.     The Smart Driver service was pitched as a way for drivers to improve their driving and reduce depreciation of their vehicles: "OnStar Smart

---

[5] The Evolution of OnStar, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations.

Driver monitors and scores driver behavior, noting things like hard braking, hard acceleration, etc. Participants can receive feedback and tips to improve driving skills, which can help them maximize their vehicle's performance and reduce wear and tear on the vehicle."[6]

30.    When Smart Driver is turned on, a driver's vehicle will track and record all instances of "hard braking," "hard acceleration," driving without a seatbelt, driving over 80mph, and "late night driving" (defined as driving between 12am and 4am).  The vehicle will also record a user's fuel economy, distance driven, and average speed.  Together, these data points contribute to a driver's "driver score," which is meant as a benchmark for drivers to understand how their safe driving compares to other drivers.[7]

31.    Customers can enroll in OnStar services (including Smart Driver) at the time of vehicle purchase through their dealer, or at a later date, using either their myBuick, myChevrolet, myGMC or myCadillac mobile app(s), or by visiting their vehicle brand website: https://my.chevrolet.com, https://my.cadillac.com, https://my.buick.com, or https://my.gmc.com.  When a customer purchases OnStar through their dealer, the dealer may activate the system (including Smart Driver) prior to the customer taking possession of the vehicle.

32.    When a customer signs up to use OnStar services, the myBuick app, myChevrolet app, myGMC app, or myCadillac app, the customer enters into a contract with GM Holdings.

33.    OnStar is a subscription service, generally costing at least $29.99 per month (with premium plans costing up to $49.99 per month).[8]

---

[6] *Id.*

[7] *Reading Into Your Chevrolet, Buick, GMC and Cadillac Smart Driver Score*, OnStar (Jan. 28, 2020), https://www.onstar.ca/en/tips/reading-into-your-smart-driver-score (addressing OnStar Smart Driver's operation in Canada, which largely mirrors its operation in U.S. vehicles).

[8] https://www.onstar.com/pricing.

34.     However, there is no charge for vehicle owners to enroll in OnStar Smart Driver. Any customer owning a GM vehicle produced since 2015 can sign up for the service, and customers who subscribe to any of the paid OnStar plans can access an enhanced version of the service called "OnStar Smart Driver+."

### GM & OnStar Sell Driving Data to LexisNexis and Verisk, Who In Turn Sell Individualized Data to Insurance Companies

35.     Despite pitching Smart Driver as a free service for GM customers to improve their driving, GM, GM Holdings, and OnStar use customers' driving data for more than that—they also sell that driving data for their own financial gain.

36.     Since Smart Driver was introduced in 2016, GM and GM Holdings have bundled consumers' driving data—their driving scores, their location data, and *every single instance* that a driver engages in hard braking, hard accelerating, driving at high speeds, and driving late at night—and market that data to consumer risk analysis companies like LexisNexis and Verisk.

37.     This bundling is unsurprising, given the substantial profit that can be made in the vehicle telematics market, which was estimated to be worth nearly $73 billion in 2022.[9]  Indeed, based on recent reporting on the practice, GM, GM Holdings, and OnStar make "millions" of dollars a year from illegal sales of their consumers' driving data.[10]

38.     These sales have been a central part of the OnStar Smart Driver service since its launch in 2016.  Just before Smart Driver launched, Verisk announced the creation of a "Verisk Telematics Data Exchange," which would allow manufacturers to share vehicle telematics data with insurance companies. In

---

[9] *Vehicle Telematics Market Size Worth USD 280.78 billion, Globally, by 2030 at a CAGR of 18.5%,* Yahoo! Finance, https://finance.yahoo.com/news/vehicle-telematics-market-size-worth-100500255.html

[10] Hill, *supra* note 1.

its first announcement about the exchange, Verisk highlighted that General Motors (and OnStar) would be its inaugural auto manufacturer partner in its new venture.[11]

39.    On information and belief, GM, GM Holdings, and OnStar use in-car telematics equipment to intercept data about consumers' driving behavior and their location data from a given vehicle's on-board computer, transmit this data to a server, and then compile and sell consumers' data in bulk to the Verisk Telematics Data Exchange.

40.    Similarly, in 2017, LexisNexis launched the "LexisNexis Telematics Exchange," which was specifically built to provide a platform for insurance carriers and automotive manufacturers to share "telematics-based driving behavior data and vehicle insights."[12]   Since then, LexisNexis' platform has expanded dramatically, with 42% of the U.S. auto insurance market, including 5 of the top 10 insurers participating on the platform as of 2022.[13]

41.    On information and belief, GM, GM Holdings, and OnStar use in-car telematics equipment to intercept data about consumers' driving behavior and their location data from a given vehicle's on-board computer, transmit this data to a server, and then compile and sell consumers' data in bulk to the LexisNexis Telematics Exchange.

### Drivers Face Increased Insurance Rates Due to Smart Driver Sharing Their Data

42.    When risk analysis companies like LexisNexis or Verisk receive individualized driving data from a manufacturer like GM, that data is then "normalized and used to generate scores and attributes that are more easily ingested

---

[11] *Verisk Insurance Solutions Announces GM as Inaugural Auto Manufacturer to Join Telematics Data Exchange*, Verisk (Sept. 2, 2015), https://www.verisk.com/company/newsroom/archive/verisk-insurance-solutions-announces-gm-as-inaugural-auto-manufacturer-to-join-telematics-data-exchange/.

[12] *LexisNexis Telematics Exchange Celebrates 5-Year Anniversary*, LexisNexis Risk Solutions (June 28, 2022), https://risk.lexisnexis.com/about-us/press-room/press-release/20220628-telematics-exchange-5-year-anniversary.

[13] *Id.*

into insurance workflows to help better assess risk"—i.e., paint a clearer picture of a customer's driving history.[14]

43.    Having access to such a vast and detailed set of driving data and location data allows insurers to know far more than they ever have about the driving behavior of the insured—and consequently, price their customers' rates accordingly.

44.    LexisNexis boasts about the likelihood of rate hikes when insurers purchase data compiled from manufacturers like GM, promising insurers that they can "improve your ability to assess risk and capture otherwise missed premium."[15]

45.    Likewise, Verisk promises that its product "uses advanced analytics to transform raw trip and sensor data into insurance-ready insights," and compiles "rich, trip-level data from millions of vehicles . . . to give insurers purpose-built access to risk insights that support superior decision-making across the policy life cycle."[16]

46.    GM vehicle owners and lease owners across the country—many of whom have never had a traffic violation or accident—are now facing drastically increased insurance rates as a result of GM's and GM Holdings' undisclosed sharing of their data with third parties and insurers, and even facing difficulty finding any insurance at all.

47.    A Chevrolet Bolt owner in Seattle, Washington, has never been responsible for an accident, and his insurance rates have long been stable as a result. But in 2022, his car insurance jumped nearly 21 percent due to an extensive 258-

---

[14] *LexisNexis® Telematics OnDemand*, LexisNexis Risk Solutions, https://risk.lexisnexis.com/products/telematics-ondemand (last visited Apr. 23, 2024).

[15] *LexisNexis® Driving Behavior 360*, LexisNexis Risk Solutions, https://risk.lexisnexis.com/products/driving-behavior-360 (last visited Apr. 23, 2024).

[16] Michelle Pantina, *Verisk Remains Hyundai's Exclusive Provider of Telematics Data to Insurers*, Globe Newswire (Feb. 9, 2023), https://www.globenewswire.com/en/news-release/2023/02/09/2605077/0/en/Verisk-Remains-Hyundai-s-Exclusive-Provider-of-Telematics-Data-to-Insurers.html.

page driving report that his car's Smart Driver service had reported to LexisNexis, detailing 640 different trips he had taken in his Chevrolet vehicle.[17]

48.     Similarly, a Cadillac owner in Palm Beach County, Florida, had no issues finding affordable insurance for years.  But after his Cadillac started sharing his driving data with GM, he was denied auto insurance by seven different insurance companies.  When he finally found car insurance through a private insurance broker, his rate was nearly twice what he previously paid per month.[18]

49.     The data that Smart Drive collects from users is often decontextualized from the ways that vehicle owners can safely operate their vehicles at high speeds, and other supposed "red flags in the app."

50.     One driver, for instance, racked up several "fast acceleration" warnings after he took his Chevrolet Corvette—which Chevrolet specifically markets as a high-speed sports car—to a "track day" where he tested out the Corvette's features on a professional racetrack.[19]

51.     Indeed, despite these real-world consequences of data from Smart Driver and similar programs being shared with third parties and insurers, the underlying data is fundamentally flawed, and in some cases is simply wrong about drivers' safe driving behavior.[20]

52.     For example, in large portions of the western United States, 80 mph is the standard speed limit on interstate highways,[21] but a driver operating their

---

[17] Hill, *supra* note 1.

[18] *Id.*

[19] *Id.*

[20] Jason Torchinsky, *Carmakers Are Sneakily Sharing Your Driving Data with Insurance Companies but What's Worse Is That the Data Is Crap*, Autopian (Mar. 19, 2024), https://www.theautopian.com/carmakers-are-sneakily-sharing-your-driving-data-with-insurance-companies-but-whats-worse-is-that-the-data-is-crap/.

[21] *State Speed Limit Chart*, NATIONAL MOTORIST ASSOCIATION, available at https://ww2.motorists.org/issues/speed-limits/state-chart/ (last accessed May 11, 2024).

vehicle at those speeds will automatically be penalized with "high speed driving" by Smart Driver.

53.    Alternatively, when a driver encounters a child or animal suddenly enter the roadway, sudden braking is the appropriate defensive driving response in that scenario, but that driver will be penalized with "hard braking" by Smart Driver.

54.    Without this context, data that GM, GM Holdings, and OnStar sell to third parties is misleading, inaccurate, bears little relationship to a user's actual safe driving abilities.

### Drivers Never Consent to Sale of Their Driving Data

55.    GM, GM Holdings, and OnStar engage in these data sharing practices despite *never* disclosing that they would share drivers' data in their privacy policies, terms and conditions of service, or other documents and webpages presented to customers, which precludes drivers from having any meaningful consent to the sharing of their data.

56.    For example, OnStar's frequently asked questions webpage (as of September 2023) contained no language about sharing drivers' data with third parties, beyond a statement that "OnStar doesn't share personally identifiable information with an insurance company without your express consent."[22]  Indeed, elsewhere on the page, OnStar strongly emphasized that Smart Driver information would never be shared with other drivers, and that OnStar took the security of drivers' data "very seriously."

57.    More broadly, the OnStar Privacy Statement from January 2023 notes that OnStar "may" share drivers' information with certain third party companies, but only to "to develop, enhance, provide, service, maintain, and improve the safety, security, and quality of our products, programs, and services," as well as for product marketing. Nowhere does the Statement give OnStar users any warning

---

[22] *Help: Smart Driver* (FAQ), OnStar, https://www.onstar.com/support/faq/smart-driver.

that their driving data may be sold to risk assessors and insurers to better understand users' driving behavior.

58.     Even if OnStar's privacy policies and statements *did* include language noting that driving behavior was being sold to third parties, most users may easily miss the small links to the documents when registering through their app, or be unable to navigate to the documents when registering through their in-car infotainment system.

59.     Many users may also never have a chance to review these documents before Smart Driver starts collecting and sharing their driving behavior.  Some dealerships may sign up customers for OnStar trial services without their consent— in part due to a bonus structure for GM car salespeople that incentivizes OnStar signups.[23]  Some drivers may activate OnStar and related services via phone.  And some drivers may unknowingly purchase a used vehicle with OnStar capabilities (including Smart Driver) already activated.

***Plaintiff Has Faced Significant Financial Consequences due to Defendants' Sharing of His Data Without His Consent***

60.     Plaintiff purchased a new 2023 Chevrolet Bolt EUV from a Chevrolet dealer in Southern California in December of 2022.

61.     After purchasing the vehicle but prior to Plaintiff picking up his Bolt EUV, the dealership set up several features on Plaintiff's vehicle, including a subscription to OnStar and enrollment in the OnStar Smart Driver program.

62.     The dealership also offered to download and set up the myChevrolet app on Plaintiff's mobile phone, but Plaintiff subsequently downloaded the myChevrolet app on his own.

63.     Because the dealer activated Plaintiff's OnStar and Smart Driver services, Plaintiff never saw any privacy disclosures nor terms and conditions for either program when these services were set up on his vehicle.

---

[23] Hill, *supra* note 1.

64.    Additionally, Plaintiff was only presented with terms and conditions for the myChevrolet app via a small, barely noticeable link during the signup process for the app.

65.    Even if Plaintiff was given sufficient notice of any of these terms of service at some point in the signup process, these terms would have never clearly alerted him that the Smart Driver service would collect and share his driving data.

66.    Once Plaintiff began driving his Bolt EUV, he received regular reports from his vehicle, including vehicle diagnostics information and links to view the data that Smart Driver collected about his driving habits.  As of April 2024, however, Plaintiff can no longer access his Smart Driver data as GM has discontinued the service.

67.    Since Plaintiff started driving his new Bolt EUV in December 2022, his auto insurance rates have gone up significantly.

68.    In early 2024, Plaintiff became aware that GM may be sharing his location data and driving data collected through the Smart Driver service after news reports of GM's practices emerged.

69.    Given that Plaintiff's data was collected through the Smart Driver service, he is informed and believes that his data, including his location data and personal driving history, was sold to third parties such as LexisNexis, Verisk, and his own and other auto insurance companies.

70.    Plaintiff recognizes that many factors go into car insurance rates. However, Plaintiff is informed and believes that GM's and GM Holdings' sale of his personal driving was a factor in the increased auto insurance rates that he has faced since purchasing his new Chevrolet vehicle, and that he now pays more for auto insurance that he otherwise would have absent GM's and GM Holdings' sharing of his driving data without his consent.

## V.   FRAUDULENT CONCEALMENT AND TOLLING

71.   The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct—through, among other things, their deceptive language to consumers during the registration process for OnStar and Smart Driver, misleading public statements, and hidden and ambiguous privacy policies and terms of use. Plaintiff and the Classes were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

72.   Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiff and the Classes. Defendants are therefore estopped from relying on any statute of limitations.

73.   Defendants' fraudulent concealment is common to the Classes.

## VI.   CLASS ACTION ALLEGATIONS

74.   Plaintiff brings this action, individually, and on behalf of a class and subclass of similarly situated persons, pursuant to Fed. R. Civ. P. 23, defined as follows:

> **Nationwide Class**
>
> All persons residing in the United States during the relevant class period that owned or leased a GM vehicle and whose driving data was collected and shared with a third party without their consent.
>
> **California Subclass**
>
> All persons residing in California during the relevant class period that owned or leased a GM vehicle and whose driving data was collected and shared with a third party without their consent (the "California Subclass").[24]

---

[24] Plaintiff reserves the right to modify or refine the definition of the Classes.

75. Excluded from the Class and California Subclass (collectively, the "Classes") are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

76. **Ascertainability**. The Classes are readily ascertainable because they are defined using objective criteria so as to allow Class members to determine if they are part of the Classes. Further, the Classes can be readily identified through records maintained by Defendants.

77. **Numerosity**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of Class members, as herein identified and described, is not known, but publicly available information reveals that there are millions of GM vehicles in the United States. California makes up roughly 12% of the nation's population and is believed to be home to a disproportionate number of GM customers relative to other states.

78. **Commonality**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

a) whether Defendants engaged in the activities and practices referenced above;

b) whether Defendants' activities and practices constitute a violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. Code § 502;

c)      whether Defendants' activities and practices constitute an intrusion upon seclusion;

d)      whether Defendants' activities and practices constitute a violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL");

e)      whether Defendants' activities and practices constitute a violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*. ("FAL");

f)      whether Defendants violated the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*. ("CCPA") by collecting, using, and selling personal information without providing consumers with notice;

g)      whether Defendants' activities and practices constitute breach of contract;

h)      whether Defendants' activities and data collection practices constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

i)      whether Plaintiff and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices, and, if so, in what amount;

j)      whether Defendants profited from their activities and practices, and, if so, in what amount;

k)      what is the appropriate injunctive relief to ensure that Defendants no longer unlawfully collect and sell data about Plaintiff and class members' driving behavior; and

l)      what is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third parties destroy unlawfully-acquired driver data in their possession, custody or control.

79.    **Typicality**. Plaintiff's claims are typical of the claims of members of the Classes because, among other things, Plaintiff and members of the Classes sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants. Further, all Class members were subject to the collection of their driving data through the Smart Driver service. Likewise, Defendants' misconduct impacted all Class members in the same manner.

80.    **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests do not conflict with the interests of the Class members, and Plaintiff has retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Classes.

81.    **Predominance & Superiority**. Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

82.    **Final Declaratory or Injunctive Relief**. Defendants have acted or refused to act on grounds that apply generally to the Class and Subclass, making final declaratory and/or injunctive relief appropriate with respect to the Class and California Subclass as a whole.

83.   **Particular Issues**. The claims consist of particular issues that are common to all Class and California Subclass members and are capable of class-wide resolution that will significantly advance the litigation.  These issues include but are not limited to:

a)   whether Defendants unlawfully collected driving data from consumers;

b)   whether Defendants adequately disclosed their data collection practices to consumers;

c)   whether Defendants used dark patterns or deceptive practices to gain access to consumers' driving data as alleged herein;

d)   whether Defendants breached a contractual obligation to members of the Classes by violating the terms and conditions of OnStar and Smart Driver;

e)   whether Defendants failed to comply with its own policies and applicable laws, regulations and industry standards relating to data collection and use; and

f)   whether Plaintiff and members of the Classes are entitled to actual damages, statutory damages, other injunctive relief, and/or punitive damages because of Defendants' wrongful conduct.

## VII. <u>CAUSES OF ACTION</u>

**FIRST CAUSE OF ACTION**
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class against GM,**
**GM Holdings, and OnStar)**

84.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

85.   Plaintiff and the Class have conferred substantial benefits on GM, GM Holdings, and OnStar through their driving data, which was never intended for public consumption and use. Such benefits include but are not limited to the

revenues and profits resulting from GM, GM Holdings, and OnStar's collection and sale and Plaintiff and Class members individual driving histories to third parties like LexisNexis and Verisk and, indirectly, insurance companies.

86.     GM, GM Holdings, and OnStar knowingly and willingly accepted and enjoyed these benefits.

87.     GM, GM Holdings, and OnStar either knew or should have known that the benefits rendered by the Plaintiff and the Class were given through misrepresentation and deception. For GM, GM Holdings, and OnStar to retain the aforementioned benefits under these circumstances is inequitable.

88.     Through deliberate violation of the Plaintiff's and the Class's privacy interests, and statutory and constitutional rights, GM, GM Holdings, and OnStar each reaped benefits that resulted in each Defendant wrongfully receiving profits.

89.     Equity demands disgorgement of GM, GM Holdings, and OnStar's ill-gotten gains. GM, GM Holdings, and OnStar have been unjustly enriched and will continue to be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiff and the Class.

90.     As a direct and proximate result of GM, GM Holdings, and OnStar's wrongful conduct and unjust enrichment, the Plaintiff and the Class are entitled to restitution from GM, GM Holdings, and OnStar and institution of a constructive trust disgorging all profits, benefits, subscription fees, and other compensation obtained by GM, GM Holdings, and OnStar through this inequitable conduct.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(In the Alternative, On Behalf of the Plaintiff and the Class**
**Against GM, GM Holdings, and OnStar)**

91.     Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

92.     Alternatively, to the extent GM, GM Holdings, and OnStar successfully assert that any terms of service form a binding contract that

sufficiently defines the parties' rights regarding GM, GM Holdings, and OnStar's use of Plaintiff's and Class members' location information, thereby rendering a claim for restitution or unjust enrichment unavailable (which Plaintiff denies in the first instance), then Plaintiff alleges that GM, GM Holdings, and OnStar's conduct constitutes a breach of any such binding contract.

93.    Specifically, to the extent that GM, GM Holdings, and OnStar's relationship with their users is governed by various terms of service and privacy statements, such as the GM Privacy Statement, terms of service for mobile apps like myChevrolet, and the OnStar Privacy Statement, these documents set forth explicit promises by GM, GM Holdings, and OnStar that customers' personally identifiable, confidential information would not be shared with insurance companies without their consent.

94.    For example, OnStar explicitly states that "OnStar doesn't share personally identifiable information with an insurance company without your express consent."

95.    GM and OnStar are third-party beneficiaries of GM Holdings' contract with GM vehicle owners.

96.    GM, GM Holdings, and OnStar breached these promises by intercepting and collecting drivers' data and then packaging and selling that data to LexisNexis and Verisk.

97.    Plaintiffs and Class members fulfilled their obligations under the relevant contracts and are not in breach of any relevant contracts.

98.    As a result of GM, GM Holdings, and OnStar's breach, they were able to acquire personal property of Plaintiff and Class members and earn unjust profits.

99.    To the extent that Plaintiff and Class members agreed to any such contract, they also failed to receive the benefit of the bargain for which they contracted and for which they paid valuable consideration in the form of (i) the

personal information they agreed to share, which has ascertainable value to be proven at trial, and (ii) OnStar subscription payments.

100.  Plaintiff, on behalf of himself and Class members, seeks compensatory damages, consequential damages, and/or non-restitutionary disgorgement, including disgorgement of subscription fees, in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

**THIRD CAUSE OF ACTION**
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class against LexisNexis and Verisk)**

101.  Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

102.  Plaintiff and the Class have conferred substantial benefits on LexisNexis and Verisk through their driving data, which was never intended for public consumption and use. Such benefits include but are not limited to the revenues and profits resulting from LexisNexis and Verisk's acquisition and packaging of consumers' driving data for sale to insurance companies.

103.  LexisNexis and Verisk knowingly and willingly accepted and enjoyed these benefits.

104.  LexisNexis and Verisk either knew or should have known that the benefits rendered by the Plaintiff and the Class were given through misrepresentation and deception. For LexisNexis and Verisk to retain the aforementioned benefits under these circumstances is inequitable.

105.  Through deliberate violation of the Plaintiff's and the Class's privacy interests, and statutory and constitutional rights, LexisNexis and Verisk each reaped benefits that resulted in each Defendant wrongfully receiving profits.

106.  Equity demands disgorgement of LexisNexis and Verisk's ill-gotten gains. LexisNexis and Verisk have been unjustly enriched and will continue to be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiff and the Class.

107.   As a direct and proximate result of LexisNexis and Verisk's wrongful conduct and unjust enrichment, Plaintiff and the Class are entitled to restitution from LexisNexis and Verisk and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by LexisNexis and Verisk through this inequitable conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class Against All Defendants)**

108.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

109.   Plaintiff and the Class hold, and at all relevant times held, a legally protected privacy interest in the personally-identifiable driving data that Defendants have scraped, packaged, and sold.

110.   There is a reasonable expectation of privacy concerning Plaintiff's and the Class's data, location information, and driving records, under the circumstances present.

111.   The reasonableness of Plaintiff's and the Class's expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiff and the Class's driving histories, through the use of dark patterns and otherwise.   Plaintiff's and the Class's expectation is particularly reasonable in light of the stated (deceptive) purpose of the Smart Driver program and corresponding promises in documents and webpages.

112.   Defendants' conduct constitutes and, at all relevant times, constituted a serious and offensive invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of—and allow third-party companies to take and make use of—Plaintiff's and the Class's private and personally identifiable data and content. Defendants intentionally invaded Plaintiff's and the Class's privacy interests by intentionally

designing a service to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

113.  These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

114.  The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiff's and the Class's private and personally identifiable data and content available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Smart Driver program. Further, Defendants' conduct targeted Plaintiff's and the Class's cars and driving histories, which commentators have referred to as consumers "sanctuaries," and record Plaintiff's and the Class's highly private personally identifiable data and behavior.

115.  Plaintiff and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

116.  Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiff.

117.  As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff's and Class members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiff and Class members as set forth above, and they are entitled to appropriate relief.

118.  Plaintiff and the Class seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure Plaintiff and the Class and were made in conscious disregard of their rights.

Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

119.   Plaintiff and the Class seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which data is actually necessary to provide information to improve drivers' safety; obtain Plaintiff's and the Class's full and informed consent prior to the collection of confidential driving information; stop transferring Plaintiff's and the Class's private and personally identifiable data to third parties; and to recall and destroy Plaintiff's and the Class's private and personally identifiable data already taken in contravention of Plaintiff's and the Class's right to privacy under the common law.

120.   A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44. Plaintiff and the Class seek restitution and disgorgement for Defendants' violation of their privacy rights.

### FIFTH CAUSE OF ACTION
#### Violation of California's Constitutional Right to Privacy
#### (On Behalf of Plaintiff and the California Subclass Against All Defendants)

121.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

122.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

123.   Plaintiff and the California Subclass hold, and at all relevant times held, a legally protected privacy interest in the personally-identifiable driving data that Defendants have scraped, packaged, and sold.

124.   There is a reasonable expectation of privacy concerning Plaintiff's and the California Subclass's data, location information, and driving records under the circumstances present.

125.   The reasonableness of Plaintiff's and the California Subclass's expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiff and the California Subclass's driving histories, through the use of dark patterns and otherwise.   Plaintiff's and the California Subclass's expectation is particularly reasonable in light of the stated (deceptive) purpose of the Smart Driver program and corresponding promises in documents and webpages.

126.   Defendants' conduct constitutes and, at all relevant times, constituted a serious and offensive invasion of privacy in violation of Plaintiff and the California Subclass's right to privacy under the California Constitution. Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of—and allow third-party companies to take and make use of—Plaintiff's and the California Subclass's private and personally identifiable data and content. Defendants intentionally invaded Plaintiff's and the California Subclass's privacy interests by intentionally designing a service to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

127.   These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

128.   The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiff's and the California Subclass's private and personally identifiable data and content available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is

further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Smart Drive program. Further, Defendants' conduct targeted Plaintiff's and the California Subclass's cars and driving histories, which commentators have referred to as consumers "sanctuaries," and record Plaintiff's and the California Subclass's highly private personally identifiable data and behavior.

129. Plaintiff and the California Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

130. Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiff.

131. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff's and California Subclass members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiff and California Subclass members as set forth above, and they are entitled to appropriate relief.

132. Plaintiff and the California Subclass seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure Plaintiff and the California Subclass and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

133. Plaintiff and the California Subclass seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which data is actually necessary to provide information to improve drivers' safety; obtain Plaintiff's and the California Subclass's full and informed consent prior to the collection of confidential driving information; stop transferring Plaintiff's and the California Subclass's private and personally identifiable data to third parties; and

to recall and destroy Plaintiff's and the California Subclass's private and personally identifiable data already taken in contravention of Plaintiff's and the California Subclass's right to privacy under the common law.

134.   A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44. Plaintiff and the California Subclass seek restitution and disgorgement for Defendants' violation of their privacy rights.

## SIXTH CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff and the Class Against All Defendants)

135.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

136.   "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

137.   Plaintiff and the Class have, and at all relevant times had, a reasonable expectation of privacy in their driving histories and related private affairs.

138.   The reasonableness of Plaintiff's and the Class's expectation of privacy is supported by the undisclosed and hidden nature of Defendants' capture and sale of Plaintiff and the Class's driving behavior and real-time location information, through the use of dark patterns and otherwise.  Plaintiff and the Class's expectations are particularly reasonable in light of the stated (deceptive) purpose of the Smart Driver program and corresponding privacy promises in documents and webpages.

139.   Defendants intentionally intruded upon the Plaintiff's and the Class's solitude, seclusion, and private affairs—and continue to do so—by intentionally designing the Smart Driver program to surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their confidential driving history.

140.   These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions.

141.   The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiff's and the Class's private and personally identifiable data available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' deceptive promises that hid the true profit-seeking motive behind the Smart Drive program. Further, Defendants' conduct targeted Plaintiff's and the Class's cars and driving histories, which commentators have referred to as consumers "sanctuaries," and record Plaintiff's and the Class's highly private personally identifiable data and behavior.

142.   Plaintiff and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

143.   Defendants' conduct was a substantial factor in causing the harm suffered by the Plaintiff and the Class.

144.   Plaintiff and the Class seek nominal, compensatory, and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiff and the Class and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

145.   Plaintiff and the Class seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop collecting driving history for sale to third parties; make clear disclosures of which data is actually necessary to provide information to improve drivers' safety; obtain Plaintiff's and the Class's full and informed consent prior to the collection of confidential driving information; stop transferring Plaintiff's and the Class's private and personally identifiable data to third parties; and to recall and destroy Plaintiff's and the Class's private and personally identifiable data already taken in contravention of Plaintiff's and the Class's right to privacy under the common law.

146.   A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44. Plaintiff and the Class seek restitution and disgorgement for Defendants' tortiously gotten profits from intruding upon the seclusion of Plaintiff and the Class.

**SEVENTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**
**(On Behalf of Plaintiff and the California Subclass Against All Defendants)**

147.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

148.   The UCL, prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

149.   Defendants violated, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

150.   Defendants violated, and continue to violate, the "unfair" prong of the UCL because they misrepresented and omitted material facts regarding the characteristics, capabilities, and benefits of the vehicles and the telematics systems they were equipped with. There is no societal benefit from such false and misleading representations and omissions, only harm.

151.   While Plaintiff and other California Subclass members were harmed by this conduct, Defendants were unjustly enriched. As a result, Defendants' conduct is "unfair" as it has offended an established public policy.

152.   Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

153.   Defendants knew when vehicles were first sold and leased that they were equipped with telematics systems that collected and transmitted information concerning drivers and passengers to third parties, including driver behavior and real-time location information, and knew that the vehicles would transmit marketable and profitable information to risk analysis vendors like LexisNexis and Verisk.

154.   Plaintiff and the California Subclass had no reason to know about any of these practices because there was no effective disclosure of the wide range of data that Defendants collected, packaged, and sold from Plaintiff's and the California Subclass's vehicles.

155.   The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendants violated and continue to violate the "fraudulent" prong of the UCL by, among other things, prominently making the representations (which also constitute advertising within the meaning of Business & Professions Code § 17200) and omissions of material facts regarding the characteristics of the vehicles, the systems they were equipped with, and their data collection and dissemination activities.

156.   Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

157.   Plaintiff and California Subclass members were deceived as a result of their reliance on Defendants' material representations and omissions, which are described above. Plaintiff and other California Subclass members suffered injury in fact and lost money as a result of purchasing a deceptively advertised vehicle by having their privacy invaded; their location data collected and transmitted to third parties; paying more than they would have for their vehicles had they know that the vehicles are equipped with systems that collect and disseminate their location data; and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

158.   Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their sale of Plaintiff's and the California Subclass's data. Plaintiff and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

159.   Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data collection and sale practices and will not recall and destroy Plaintiff's and the California Subclass's wrongfully collected private and personally identifiable data. Accordingly, injunctive relief is appropriate.

**EIGHTH CAUSE OF ACTION**
**Violation of the California Consumer Legal Remedies Act,**
**Cal. Civ. Code § 1750 *et seq.***
**(On Behalf of Plaintiff and the California Subclass Against All Defendants)**

160.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

161. Defendants are each a "person," under the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761(c).

162. Plaintiff, as well as each member of the California Subclass, is a "consumer[]," as defined by Cal. Civ. Code § 1761(d), who purchased or leased a vehicle whose location data was collected by Defendants.

163. Defendants' conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the vehicles and the installed OnStar system, or omitting material information, violates the CLRA. Specifically, Defendants violated the CLRA by omitting material facts and failing to disclose their data collection and transmission practices, engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions that were intended to result in, and did result in, the collection and dissemination of Plaintiff's and California Subclass members' location data:

a. misrepresenting the source, sponsorship, approval, or certification of goods or services;

b. misrepresenting the affiliation, connection, or association with, or certification by, another;

c. representing that the vehicles equipped with the data collection and dissemination systems have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

d. representing that the vehicles equipped with the data collection and dissemination systems are of a particular standard, quality, or grade if they are of another;

e. advertising the vehicles equipped with the data collection and dissemination systems with intent not to sell them as advertised;

f. representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law;

g.      representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction; and

h.      representing that the vehicles equipped with the data collection and dissemination systems have been supplied in accordance with previous representations when they have not.

164.    Defendants violated the CLRA by selling and leasing vehicles that they knew collected and transmitted information to third parties via the telematics systems, including driver behavior and location data.

165.    Defendants failed to disclose to Plaintiff and other California Subclass members the material fact that vehicles were sold with these systems, which collected and disseminated vehicles' location data. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

166.    Defendants knew, at the time they sold Plaintiff and California Subclass members their vehicles, of the material fact that the vehicles were equipped with data collection and dissemination systems. Defendants' conduct in selling these vehicles and omitting and/or failing to disclosure information about their data collection and dissemination systems was fraudulent, wanton, and malicious.

167.    Defendants' unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and other California Subclass members suffering actual damage on account of receiving a car that contained telematics systems that collected and transmitted data to third parties.

168.    Plaintiff and the other California Subclass members paid for a vehicle that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, and which fell below the standards set by and described in Defendants' representations, Plaintiff and California Subclass members were damaged on account of having their privacy invaded; having their

location data collected and transmitted to third parties; and having paid more than they would have for their vehicles had they know that the vehicles are equipped with systems that collect and disseminate their location data. Plaintiff and the other California Subclass members suffered diminution in the value of their data and vehicles, and other damages recoverable under the law.

169.    Pursuant to § 1782 of the CLRA, Plaintiff notified Defendants in writing by mail of their particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. Plaintiff sent his notice letters on May 14, 2024.

170.    If Defendants fail to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant § 1782 of the CLRA, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

171.    Pursuant to § 1780(d) of the Act, submitted herewith is the affidavit showing that this action has been commenced in the proper forum.

## NINTH CAUSE OF ACTION
### Violation of the California False Advertising Law,
### Cal. Bus. & Prof. Code §§ 17500 *et seq.*
### (On Behalf of Plaintiff and the California Subclass Against GM, GM Holdings, and Onstar)

172.    Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

173.    The FAL prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

174.    Defendants' advertising is, and at all relevant times was, highly misleading. Defendants do not disclose at all, or do not meaningfully disclose, the manner through which they collect, aggregate, and sell drivers' confidential driving histories for millions of dollars in annual profits.

175.   Reasonable consumers, like Plaintiff and the California Subclass, are—and at all relevant times were—likely to be misled by GM, GM Holdings, and OnStar's misrepresentations. Reasonable consumers lack the means to verify GM, GM Holdings, and OnStar's representations concerning their data and content collection and use practices, or to understand the fact or significance of GM, GM Holdings, and OnStar's ability to market their driving history to the risk analysis and insurance markets.

176.   Plaintiff and the California Subclass have been harmed and have suffered economic injury as a result of GM, GM Holdings, and OnStar's misrepresentations. First, they have suffered harm in the form of diminution of the value of their private driving history. Second, they have suffered harm as a result of the invasion of privacy stemming from GM, GM Holdings, and OnStar's covert theft and sale of their private data that was never intended for public consumption. Third, they have been subjected to or will imminently be subjected to increased insurance rates as a result of GM, GM Holdings, and OnStar's unauthorized sale of their driving history.

177.   GM, GM Holdings, and OnStar, as a result of their misrepresentations, have been able to reap unjust profits and revenues from sale of Plaintiff and the California Subclass' data, improvements to their driver risk models, and increased consumer demand for and use of GM, GM Holdings, and OnStar's other products. Plaintiff and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

178.   Unless restrained and enjoined, GM, GM Holdings, and OnStar will continue to misrepresent their private and personally identifiable data collection and sale practices and will not recall and destroy Plaintiff's and the California Subclass's wrongfully collected private and personally identifiable data. Accordingly, injunctive relief is appropriate.

## TENTH CAUSE OF ACTION
### Violation of the California Consumer Privacy Act,
#### Cal. Civ. Code § 1798.100, *et seq.*
### (On Behalf of Plaintiff and the California Subclass Against All Defendants)

179. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

180. The CCPA recently was enacted to protect consumers' personal information from collection and use by businesses without appropriate notice and consent.

181. Through the above-detailed conduct, Defendants violated the CCPA by, inter alia, collecting, using, and selling personal information and location data without providing consumers with notice consistent with the CCPA, in violation of Civil Code section 1798.100(b) and section 1798.115(d), and by otherwise failing to inform users of the personal information collected about them and the third parties with whom that personal information was shared, in violation of Civil Code section 1798.110(c).

182. In accordance with Civil Code section 1798.150(b), prior to the filing of this Complaint, Plaintiff's counsel served Defendants with notice of these CCPA violations by certified mail, return receipt requested.

183. On behalf of California Subclass members, Plaintiff seeks injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA. If Defendants fail to respond to Plaintiff's notice letter or agree to rectify the violations detailed above within 30 days of the date of written notice, Plaintiff also will seek leave to amend this Complaint to assert claims for actual, punitive, and statutory damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendants' CCPA violations.

/ / /

/ / /

**ELEVENTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act ("CIPA"),**
**Cal. Pen. Code § 630, *et seq*.**
**(On Behalf of Plaintiff and the California Subclass Against All Defendants)**

184.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

185.   Cal. Pen. Code § 630 recognizes that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

186.   As alleged above, Defendants engaged in illegal data practices by storing and tracking indefinitely the location information of car owners and their driving behavior, and thus determining their movements over time (and all other inferences derivable therefrom). This data collection without car owners' full and informed consent violated and continues to violate Cal. Pen. Code § 637.7.

187.   Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to determine the location or movement of a person. As used in Cal. Pen. Code § 637.7, "electronic tracking device" means "any device attached to a vehicle or other movable thing that reveals its location or movement by the transmission of electronic signals." Cal. Pen. Code § 637.7(d).

188.   In direct violation of this prohibition, and without the consent of Plaintiff or California Subclass members, Defendants continued to record, store, and use the location and movement of Plaintiff's and California Subclass members' vehicles and provide that information to third parties.

189.   As described herein, Defendants utilized "electronic tracking devices" as defined by Cal. Pen. Code § 637.7(d), in that Defendants used "devices"—including the vehicles' own telematics systems, including, but not limited to, onboard diagnostics systems and built-in GPS functionality, which are mechanical

or electronic equipment—attached to, and located within, each California Subclass member's vehicle (a "movable thing"), including Plaintiff's, to "reveal[] its location or movement by the transmission of electronic signals."

190.  Defendants unlawfully used those electronic tracking devices "to determine the location or movement of a person"—namely, Plaintiff and California Subclass members. Defendants engaged in such storage and tracking of each California Subclass member's movement, including Plaintiff's, after Defendants had affirmatively (but falsely) misrepresented that they would not store and track each California Subclass member's movement and transmit to third parties or omitted such information altogether.

191.  Civil plaintiffs have a cause of action to enforce the provisions of CIPA and seek all forms of relief under the statute.

192.  As a result of Defendants' violations of Cal. Pen. Code § 637.7, and pursuant to Cal. Pen. Code § 637.2, Plaintiff and California Subclass members are entitled to the following relief:

   a.    a declaration that Defendants' conduct violates CIPA;

   b.    statutory damages and/or trebled actual damages;

   c.    injunctive relief in the form of, *inter alia*, an order enjoining Defendants from collecting and transmitting data of Plaintiff and California Subclass members to third parties in violation of CIPA;

   d.    injunctive relief in the form of, *inter alia*, an order requiring Defendants to destroy all data created or otherwise obtained from Plaintiff and California Subclass members; and

   e.    an award of attorneys' fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code Section 1021.5, and all other applicable laws.

**TWELFTH CAUSE OF ACTION**
**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.***
**(On Behalf of the Plaintiff and the Class against LexisNexis and Verisk)**

193.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

194.   Plaintiff brings this claim on behalf of himself and all similarly situated Class members nationwide.

195.   Plaintiff and the Class members are each a "person" and a "consumer" within the meaning of the Fair Credit Reporting Act ("FCRA"). 15 U.S.C. § 1681a(c).

196.   LexisNexis and Verisk are each individually a "consumer reporting agency" within the meaning of the FCRA. 15 U.S.C. § 1681a(f).

197.   When a consumer reporting agency like LexisNexis or Verisk prepares a consumer report, FCRA requires the agency to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual described in the report. 15 U.S.C. § 1681e(b).

198.   LexisNexis and Verisk failed to maintain reasonable procedures to maintain maximum possible accuracy regarding Plaintiff and the Class members' driver behavior data before disseminating it to auto insurance carriers.

199.   Auto insurance carriers who received this information from LexisNexis and Verisk obtained and sold an inaccurate representation of Plaintiff and the Class members through their driver behavior data.

200.   The foregoing acts and omissions constitute willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. § 1681e(b).

201.   As a result of each willful violation of the FCRA, Plaintiff and Class members are entitled to actual and statutory damages pursuant to 15 U.S.C. § 1681n(a)(1), punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from LexisNexis and Verisk.

202.   As a result of each negligent noncompliance with the FCRA, Plaintiff and the Class members are entitled to actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from LexisNexis and Verisk.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests for himself and all others similarly situated, the following relief:

a.   an order certifying this action as a class action, defining the Class and California Subclass as requested herein, appointing the undersigned as Class Counsel, and finding Plaintiff to be the proper representative of the Class and California Subclass;

b.   a permanent injunction and any other equitable relief as necessary to protect the interest of the Classes, including:

i.   an order declaring Defendants' conduct alleged herein unlawful and prohibiting Defendants from engaging in the wrongful and unlawful acts in the future; and

ii.   requiring Defendants to develop and adopt appropriate security protocols to protect vehicle owners', lessees', and users' personal information, and privacy;

c.   an award to Plaintiff and the Class and/or California Subclass members of all recoverable damages, including statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits and subscription fees unlawfully obtained;

d.   an award of attorneys' fees and costs recoverable under the claims pleaded herein, including any award of attorneys' fees and costs pursuant to Cal. Civ. Proc. Code § 1021.5; and

e.   an order entering any other relief as is just and proper.

## IX. **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 14, 2024            By:    */s/ (Eddie) Jae K. Kim*
(Eddie) Jae K. Kim (CA ID No. 234464)
Tiffine E. Malamphy (CA ID No. 312239)
**LYNCH CARPENTER, LLP**
117 E. Colorado Blvd., Suite 600
Pasadena, CA 91105
Tel:   (213) 723-0707
Fax:   (858) 313-1850
ekim@lcllp.com
tiffine@lcllp.com

Jennifer M. French (CA ID No. 265422)
**LYNCH CARPENTER, LLP**
1234 Camino Del Mar
Del Mar, CA 92014
Tel:   (619) 762-1910
Fax:   (858) 313-1850
jennf@lcllp.com

Gary F. Lynch
Connor P. Hayes
Patrick F. Donathen
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Tel.:   (412) 322-9243
Fax:   (724) 656-1556
gary@lcllp.com
connorh@lcllp.com
patrick@lcllp.com

*Attorneys for Plaintiff*
*and the Proposed Classes*